WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

In re White Electronic Designs
Corporation Securities Litigation

)
)
)
)
)
)
)
)
)
)
)
)

No. CV-04-1499-PHX-SRB

**ORDER**

Before the Court are Defendants' Motion to Dismiss the Lead Plaintiff's Consolidated Complaint for Violations of Federal Securities Laws pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA") (Doc. 44), Defendants' Motion to Dismiss or in the alternative to Strike Pipefitters' 1933 Act Claims pursuant to Rules 12(b)(6) and 12(f) of the Federal Rules of Civil Procedure and the PSLRA (Doc. 43), and Defendants' Request for Judicial Notice and Identification of Documents Incorporated by Reference into the Consolidated Complaint (Doc. 46). The Court now rules on the motions and request for judicial notice.

## I.     BACKGROUND

This is a federal securities class action[1] filed on behalf of all those who purchased or otherwise acquired White Electronic Designs Corp. ("WEDC") securities between January 23, 2003 and June 9, 2004 ("Class Period") and who were allegedly damaged thereby ("Class").   Lead Plaintiff is the Wayne County Employees' Retirement System ("Wayne County") which purchased WEDC securities during the Class Period at "artificially inflated prices" and suffered damages as a result of Defendants' alleged securities laws violations. Joining the Lead Plaintiff is Pipefitters Local 522 & 633 Pension Trust Fund ("Pipefitters") (collectively "Plaintiffs").   In addition to WEDC, the Complaint names as Defendants three of WEDC's principal officers and directors, Hamid R. Shokrgozar, William J. Rodes and Edward A. White ("Individual Defendants") (collectively with WEDC, "Defendants").

WEDC is in the business of designing and manufacturing microelectronic and display components and systems for use in the military and commercial markets.   WEDC derives a large share of its revenues and earnings from its sales to defense contractors for use in military programs.   The U.S.-led military operations in Afghanistan and Iraq boosted WEDC's military orders in 2002 and 2003, and Plaintiffs claim that "[a]t all relevant times, defendants represented that the growth trend in military sales was sustainable and a harbinger of 'long-term growth and profitability' for the Company." (Compl. ¶ 31.)   Plaintiffs allege that "[e]ach of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of WEDC common stock by disseminating materially false and misleading statements and/or concealing material adverse facts" relative to WEDC's financial status that caused "Plaintiffs and other members of the Class to purchase [WEDC] common stock at artificially inflated prices." (Compl. ¶ 22.)   In particular, Plaintiffs allege that WEDC "materially overstated" its sales of microelectronic products to the military sector during the first three quarters of fiscal year 2003 when

---

[1]Initially there were four related actions, which were consolidated. (*See* Court's Order in Civil Case No. 04-1499 entered Dec. 9, 2004.)   The Consolidated Complaint filed February 14, 2005 will be referred to as "Complaint."

Defendants "knew or recklessly disregarded that [WEDC's] increasing revenue and earnings could not be sustained and that orders for sales of the Company's microelectronic products for use in military weapons and procurement programs had been declining since at least the second quarter of fiscal 2003." (Compl. ¶ 2.)  In addition, Plaintiffs allege that "[p]rior to disclosing these adverse facts to the investing public, [WEDC] completed a $45 million secondary offering . . . and allowed its Vice Chairman, Edward A. White, to sell 500,000 of his personally-held shares valued at $5 million to the unsuspecting public." (Compl. ¶ 3.)

The Class Period begins on January 23, 2003, when WEDC issued a press release announcing its acquisition of a company called Interface Data Systems, Inc. ("IDS"). Plaintiffs allege that WEDC was able to complete the acquisition of IDS "by using its artificially inflated shares as currency for the transaction." (Compl. ¶ 22.)  Then, amidst optimistic statements about its past and future revenues, WEDC announced on June 2, 2003 that it had filed a registration statement ("Registration Statement") with the Securities and Exchange Commission ("SEC") for the public offering of up to 3,750,000 shares of its common stock ("Secondary Offering").    On July 2, 2003, WEDC announced the commencement of a public offering of 4.5 million shares of its common stock for $10 per share.  2.2 million of the shares sold were owned by WEDC; 2 million of the shares sold were owned by New York Life; and 300,000 shares were owned by Mr. White.[2] (Defs.' Mot. to Dismiss or in the Alternative to Strike Pipefitters' 1933 Act Claims ("Defs.' Mot. re Pipefitters' Claims") at 3.)  That same day Pipefitters bought 500 shares of WEDC stock for $5,000. (Defs.' Mot. re Pipefitters' Claims at 3.)  On July 3, 2003, WEDC filed a final prospectus supplement with the SEC ("Prospectus"), incorporating by reference WEDC's first and second quarter 10-Qs.  WEDC's stock reached a Class Period high of $14.11 around September 16, 2003. (Compl. ¶ 123, n.8.)

---

[2]Defendant White sold an additional 200,000 shares on August 1, 2003. (Defs.' Mot. re Pipefitters' Claims at 3 n.2.)

On November 11, 2003, WEDC issued a press release announcing that it was rescheduling the release of its financial results for the fourth quarter and fiscal year which ended September 27, 2003.  When WEDC announced that it needed additional time to complete its financial statements, its share price "fell approximately 21%, or $2.33 per share, to close at $8.55 per share . . . ."  (Compl. ¶ 5.)  Pipefitters sold its 500 shares between November 14 and 19, 2003, for a loss of $540.49.  (Defs.' Mot. re Pipefitters' Claims at 3, n.1.)  WEDC released its financial results for the fourth quarter and fiscal year 2003 on November 25, 2003.  WEDC announced at that time that it was restating the results for the first three quarters of fiscal 2003 ("Restatement") due to a change in the way it recognized revenue from sales to a single reseller.

On June 9, 2004, WEDC announced "a 20% revenue shortfall for the third quarter for fiscal 2004" due to "a 30% decline in sales of the Company's high-reliability products to the military and defense sector."  (Compl. ¶ 7.)  Following that announcement, "the price of [WEDC] common stock dropped further, falling to $5.16 per share on heavy trading volume."  (Compl. ¶ 8.)  The four class action lawsuits were filed in July and August 2004.

Plaintiffs allege that Defendants artificially inflated WEDC's stock price by engaging in a variety of fraudulent accounting practices to mask WEDC's true financial condition – practices that did not comport with Generally Accepted Accounting Principles ("GAAP").  In particular, Plaintiffs allege that Defendants misled investors by materially overstating Class Period revenues; by reporting sizable backlog orders and bookings of new orders when the company had "no reasonable basis" for those reports; by "prematurely ship[ping] product to customers so that revenue recognition could be accelerated in a particular accounting period"; and by materially overstating WEDC's military sales results.   (Compl. ¶¶ 33-35, 41, 48.)

In addition to WEDC's regulatory filings, press releases, and securities analysts' reports, Plaintiffs rely on information from unnamed former WEDC employees to support their allegations.  These former employees held the following positions within WEDC: sales representative from April 1997 to November 2003 ("CI 1"); senior buyer during the Class

Period ("CI 2"); divisional controller from July 1999 to October 2003 ("CI 3"); inventory supervisor from May 1998 to October 2003 ("CI 4"); human resources manager from January 1994 to November 2003 ("CI 5"); accounting department employee of a WEDC subsidiary from October 2000 to September 2003 ("CI 6"); product manager from March 1998 to September 2003 ("CI 7"); quality manager from February to August 2004 ("CI 8"); regional sales representative from July to August 2004 ("CI 9").  (Compl. ¶¶ 37-41, 51, nn.1-5.)

Plaintiffs filed five claims in all.  The first, second and third claims are made by Pipefitters and allege violations of the Securities Act of 1933 ("1933 Act").  The fourth and fifth claims filed on behalf of all Class members allege violations of the Securities Exchange Act of 1934 ("1934 Act").

The first claim alleges that Defendants violated § 11 of the 1933 Act, 15 U.S.C. § 77k, based on a Registration Statement for the Secondary Offering that Pipefitters claim "was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts."  (Compl. ¶¶ 130-137.)  The second claim alleges that Defendants violated § 12(a)(2) of the 1933 Act, 15 U.S.C. § 77l, by publishing a Prospectus for the Secondary Offering that Pipefitters claim "contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts."  (Compl. ¶¶ 138-145.)  The third claim alleges that the three Individual Defendants, as "control persons," violated §§ 11 and 12(a)(2) of the 1933 Act, 15 U.S.C. § 77.  (Compl. ¶¶ 146-149.)

The fourth and fifth claims were brought pursuant to the 1934 Act.  The fourth claim alleges that Defendants violated § 10(b) of the 1934 Act through "a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did," deceive and defraud the investing public, including Plaintiffs, by "conceal[ing] adverse material information about the business, operations and future prospects of WEDC" which artificially inflated the price of WEDC's common stock.  (Compl. ¶¶ 150-159.) The fifth and final claim alleges violations of § 20(a) of the 1934 Act by the Individual Defendants, who, as

1    "controlling persons" of WEDC "had the power to influence and control and did influence

2    and control, directly or indirectly, the decision-making of the Company, including the content

3    and dissemination of the various statements which Plaintiffs contend are false and

4    misleading." (Compl. ¶¶ 161-164.)

5         Plaintiffs are requesting a determination that this is a proper class action and

6    certification as Class representatives and Lead Counsel under Rule 23 of the Federal Rules

7    of Civil Procedure. (Compl. at 55, ¶ A.)   Plaintiffs are seeking compensatory damages,

8    rescission on the second claim for any Plaintiffs that still hold WEDC Shares, or if sold,

9    recissory damages under § 12(a)(2) of the 1933 Act, as well as Plaintiffs' "reasonable costs

10   and expenses incurred in this action, including counsel fees and expert fees," and any other

11   relief the Court deems just and proper. (Compl. at 55, ¶¶ B-E.)

12        Defendants have filed two motions to dismiss. In one, Defendants ask the Court to

13   dismiss Plaintiffs' Complaint for failing to adequately plead securities fraud. (Defs.' Mot. to

14   Dismiss Compl. for Violations of Federal Securities Laws ("Defs.' Mot. to Dismiss Compl.")

15   at 1-2.)  The other motion by Defendants asks the Court to dismiss, or, in the alternative, to

16   strike Pipefitters' 1933 Act Claims for three reasons: (1) because the claims are barred by the

17   statute of limitations; (2) because Pipefitters' has not pleaded a violation of the 1933 Act; and

18   (3) because Pipefitters lacks standing to represent the proposed class. (Defs.' Mot. re

19   Pipefitters' Claims at 1-2.) Defendants have also requested that the Court take judicial notice

20   of documents incorporated by reference into the Complaint.

21   **II.    JUDICIAL NOTICE**

22        As a preliminary matter, the Court will address Defendants' request for judicial notice

23   of certain exhibits. Generally, on a motion to dismiss, a court limits its review to the contents

24   of the complaint, and may consider material that is properly presented to the court as part of

25   the complaint. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001) (citation

26   omitted). In addition, a court may take judicial notice of "matters of public record" without

27   converting a motion to dismiss into a motion for summary judgment. *Id.* (citing Fed. R.

28   Evid. 201; *MGIC Indem. Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir. 1986)). Thus,

1    "[j]udicial notice is appropriate for SEC filings, press releases, and accounting rules as they

2    are 'capable of accurate and ready determination by resort to sources whose accuracy cannot

3    be reasonably questioned.'" *In re Network Assoc., Inc. II Sec. Litig*., 2003 WL 24051280, at

4    *1 n.3 (N.D. Cal. Mar. 25, 2003) (citing Fed. R. Evid. 201(b); *Plevy v. Haggerty*, 38 F. Supp.

5    2d 816, 821 (C.D. Cal. 1998); *Urbanek v. United States*, 731 F.2d 870, 873 n.3 (Fed Cir.

6    1984)).   A court may also consider documents that are referenced in the complaint, if the

7    authenticity of those documents is not at issue and the complaint relies on those documents.

8    *Lee*, 250 F.3d at 688-89 (citations omitted).   However, "a court may not take judicial notice

9    of a fact that is 'subject to reasonable dispute.'" *Id.* (quoting Fed. R. Evid. 201(b)).

10         In this case, Defendants have requested judicial notice of thirteen exhibits.   (*See* Decl.

11   of Sherry Hartel Haus in Support of Defs.' Mot. to Dismiss Compl. and Defs.' Mot. re

12   Pipefitters' Claims ("Haus Decl.").)   Exhibits two through eight consist of WEDC's SEC

13   filings.   As such, judicial notice of exhibits two through eight is proper, and the Court takes

14   judicial notice of all the documents attached to the Haus Declaration that WEDC filed with

15   the SEC.   Exhibit one is a WEDC press release dated November 25, 2003 reporting results

16   for the fourth quarter and fiscal year ended September 27, 2003.   Paragraph 46 of the

17   Complaint contains a quote made by Defendants on November 25, 2003 which is also found

18   on page 2 of exhibit one.   While it is not clear that Plaintiffs are quoting from the press

19   release found in exhibit one, the Court "may take judicial notice of information that was

20   publicly available to reasonable investors at the time the defendant made the allegedly false

21   statements." *In re Portal Software, Inc. Sec. Litig*., 2005 WL 1910923, at *4 (N.D. Cal. Aug.

22   10, 2005) (noting that "[t]his is true of press releases, even if they were not explicitly

23   referenced in the complaint") (citations omitted).   Thus, the Court will take judicial notice

24   of exhibit one.   Exhibit nine purports to be a chart showing WEDC's stock prices from

25   January 23, 2003 to June 9, 2004.   The source of this document is not apparent from the

26   document itself, and not all of the share prices on this chart comport with share prices for

27   specific dates listed in the Complaint.   Plaintiffs have also stated that "there remains a

28   disputed issue of fact concerning subsequent stock price movements following the initial

1   negative disclosure [on November 11, 2003], more properly decided on summary judgment

2   or at trial." (Pl.'s Opp'n to Defs.' Mot. re Pipefitters' Claims at 13, n.11.) Therefore, the

3   Court will not take judicial notice of exhibit nine.

4        Exhibit ten is a 1998 Order from an unrelated securities class action in this district.

5   Exhibit eleven is a 2005 decision from the Fifth Circuit Court of Appeals affirming the

6   district court's dismissal of a securities class action case. Exhibit twelve is a copy of a 2004

7   Order from Chambers from another court in this district dismissing an unrelated securities

8   class action. Exhibit thirteen is a conference report from the United States House of

9   Representatives. Defendants have not explained why they have requested judicial notice of

10   exhibits ten through thirteen. As the Court is not required to take notice of exhibits ten

11   through thirteen, it declines to do so at this time.

12  **III.**   **LEGAL STANDARDS AND ANALYSIS**

13      **A.**    **Federal Rule of Civil Procedure 12(b)(6)**

14        A court considering a motion to dismiss under Federal Rule of Civil Procedure

15   12(b)(6) should dismiss only where "it appears beyond doubt that the plaintiff can prove no

16   set of facts in support of the claim which would entitle the him to relief." *Conley v. Gibson*,

17   355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957). *See also Williamson v. Gen'l Dynamics Corp.*,

18   208 F.3d 1144, 1149 (9th Cir.), *cert. denied*, 531 U.S. 929, 121 S. Ct. 309 (2000). "All

19   allegations of material fact made in the complaint are taken as true and construed in the light

20   most favorable to the plaintiff." *No. 84 Employer-Teamster Joint Council Pension Trust*

21   *Fund v. Am. West Holding Co.*, 320 F.3d 920, 931 (9th Cir. 2003) (citations omitted).

22   "However, conclusory allegations of law and unwarranted inferences are insufficient to

23   defeat a motion to dismiss for failure to state a claim." *In re Syntex Corp. Sec. Litig.*, 95 F.3d

24   922, 926 (9th Cir. 1996) (citing *In re VeriFone Sec. Litig.*, 11 F.3d 865, 868 (9th Cir. 1993)).

25        Rule 8 of the Federal Rules of Civil Procedure requires plaintiffs to give a "short and

26   plain statement" of the claim. This liberal pleading standard requires only that a plaintiff

27   give a defendant "fair notice of what the plaintiff's claim is and the grounds upon which it

28   rests." *Conley*, 355 U.S. at 47, 78 S. Ct. at 103 ("[T]he Federal rules of Civil Procedure do

not require a claimant to set out in detail the facts upon which he bases his claim.").  Rule 9(b), though, imposes an additional obligation when pleading fraud and requires that "the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  *See also Yourish v. Cal. Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999) ("Our precedents make clear that Rule 9(b) applies to actions brought under the federal securities laws.").  Thus, "the complaint must allege specific facts regarding the fraudulent activity, such as the time, date, place and content of the alleged fraudulent  representation, how or why the representation was false or misleading, and in some cases, the identity of the person engaged in the fraud."  *In re Metricom Secs. Litig.*, 2004 WL 966291, at *8 (N.D. Cal. Apr. 29, 2004) (citing *In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1547-49 (9th Cir. 1994)).  Under this standard, "'a plaintiff must set forth more than the neutral facts necessary to identify the transaction.  The plaintiff must set forth what is false or misleading about a statement, and why it is false.  In other words, the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading'" at the time it was made.  *Yourish,* 191 F.3d at 993 n.10 (quoting *In re GlenFed*, 42 F.3d at 1547-49 (noting that "neutral facts" involve the "time place, and content of an alleged misrepresentation")).

### B.    Claims under the 1934 Act

#### 1.    Section 10(b)

Section 10(b) of the 1934 Act makes it unlawful to use "any manipulative or deceptive device or contrivance" in violation of an SEC-prescribed rule "in connection with the purchase or sale of any security registered on a national securities exchange . . . ." 15 U.S.C. 78j(b).  Rule 10b-5, promulgated under § 10(b), makes it unlawful for a person to use interstate commerce:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

1            (c) To engage in any act, practice, or course of business which

2                 operates or would operate as a fraud or deceit upon any person,

3                 in connection with the purchase or sale of any security.

4   17 C.F.R. § 240.10b-5.

5      To state a claim under Rule 10b-5, a plaintiff must allege: "(1) a material

6   misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale

7   of a security, (4) transaction and loss causation, and (5) economic loss." *In re Daou Sys.,*

8   *Inc., Sec. Litig.*, 411 F.3d 1006, 1014 (9th Cir. 2005) (citing *Dura Pharms., Inc. v. Broudo*,

9   125 S. Ct. 1627, 1631 (2005)).  "If one of these elements is missing, the [plaintiff's] claim

10   fails." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir. 1996).

11      Claims brought under § 10(b) and Rule 10b-5 must meet the particularity requirements

12   of Fed. R. Civ. P. 9(b).  *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404 (9th Cir. 1996).

13   While "[o]ptimistic statements may constitute a basis for a claim under section 10(b) . . . .,

14   the fact that the prediction proves to be wrong in hindsight does not render the statement

15   untrue when made." *In re Syntex*, 95 F.3d at 926 (citations omitted).  Generally, questions

16   of whether a particular statement is misleading or whether adverse facts were adequately

17   disclosed "should be left to the trier of fact." *Id.*  "Only if the adequacy of the disclosure or

18   the materiality of the statement is so obvious that reasonable minds could not differ are these

19   issues appropriately resolved as a matter of law." *Id.* (citations, internal quotation marks and

20   deletions omitted).

21               **2.**      **Private Securities Litigation Reform Act**

22      The enactment of PSLRA in 1995 significantly altered the pleading standards in

23   securities fraud claims in order "to put an end to the practice of pleading 'fraud by hindsight.'"

24   *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 978 (9th Cir. 1999).  Thus, when a

25   private securities fraud plaintiff alleges that the defendant made an untrue statement of

26   material fact or omitted to state a material fact, the complaint must now "specify each

27   statement alleged to have been misleading, the reason or reasons why the statement is

28   misleading, and, if an allegation regarding the statement or omission is made on information

1   and belief, the complaint shall state with particularity all facts on which that belief is

2   formed."  15 U.S.C. § 78u-4(b)(1).  In addition, when the plaintiff must prove that the

3   defendant acted with a particular state of mind, the complaint must, "with respect to each act

4   or omission alleged to violate this chapter, state with particularity facts giving rise to a strong

5   inference that the defendant acted with the required state of mind."  *Id.* § 78u-4(b)(2).

6        A plaintiff who brings an action under § 10(b) of the 1934 Act must "plead with

7   particularity both falsity and scienter."  *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084

8   (9th Cir. 2002).  Falsity and scienter in securities fraud cases are generally strongly inferred

9   from the same set of facts, and the Ninth Circuit has combined falsity and scienter into a

10  single inquiry.  *No. 84 Employer-Teamster*, 320 F.3d at 931.  In the Ninth Circuit, the

11  required state of mind, i.e., the scienter requirement, is "deliberate or conscious

12  recklessness."  *In re Silicon Graphics*, 183 F.3d at 979.  Recklessness, under § 10(b) of the

13  1934 Act, is "a form of intentional conduct."  *Id.* at 977.  *See also No. 84 Employer-*

14  *Teamster*, 320 F.3d at 931-32 n.8 ("Our interpretation of the 'required state of mind' under

15  14 U.S.C. § 78u-4(b)(2) is more stringent than that of our sister circuits.").  The complaint

16  must aver facts strongly suggesting actual intent to commit fraud.  *Id.*  Merely pleading

17  "motive and opportunity" or mere recklessness, without more, is not sufficient.  *Id.*  When

18  the challenged act is a forward-looking statement – defined to include revenue projections,

19  income, earnings per share or future economic performance – the required state of mind is

20  "actual knowledge . . . that the statement was false or misleading."  15 U.S.C. § 78u-5(c)(1).

21  If the plaintiff fails to meet the pleading requirements of the PSLRA, the court, upon the

22  defendant's motion, must dismiss the complaint.   15 U.S.C. § 78u-4(b)(3)(B); *No. 84*

23  *Employer-Teamster*, 320 F.3d at 931-32 ("If a plaintiff fails to plead either the alleged

24  misleading statements or scienter with particularity, his or her complaint must be

25  dismissed.")

26       To determine whether the plaintiffs have shown a strong inference of scienter on a

27  Rule 12(b)(6) motion to dismiss brought under PSLRA, "the court must consider *all*

28  reasonable inferences to be drawn from the allegations, including inferences unfavorable to

- 11 -

1  the plaintiffs.  District courts should consider all allegations in their entirety, together with

2  any reasonable inferences that can be drawn therefrom, in concluding whether, on balance,

3  the plaintiffs' complaint gives rise to the requisite inference of scienter." *Gompper v. VISX,*

4  *Inc.*, 298 F.3d 893, 897 (9th Cir. 2002) (emphasis in original) (noting the "inevitable tension

5  . . . between the customary latitude granted the plaintiff under Fed. R. Civ. P. 12(b)(6), and

6  the heightened pleading standard set forth under the PSLRA").

7         Even when a plaintiff meets the heightened pleading requirements of the PSLRA, the

8  statute provides a safe harbor from liability for certain forward-looking statements.  *See* 78

9  U.S.C. § 78u-5(c).

10                **3.      Section 20(a)**

11        Under § 20(a) of the 1934 Act,

12                Every person who, directly or indirectly, controls any person

13                liable under any provision of this chapter or of any rule or

14                regulation thereunder shall also be liable jointly and severally

15                with and to the same extent as such controlled person to any

16                person to whom such controlled person is liable, unless the

17                controlling person acted in good faith and did not directly or

18                indirectly induce the act or acts constituting the violation or

19                cause of action.

20  15 U.S.C. § 78t(a).

21        "To be liable under section 20(a), the defendants must be liable under another section

22  of [the 1934 Act]."  *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 978 (9th Cir.

23  1999February 2, 2006).

24     **C.    1933 Act Pleading Requirements**

25            **1.      Section 11**

26        Section 11 of the 1933 Act addresses fraud in registration statements filed with the

27  SEC. *See* 15 U.S.C. § 77k(a). Specifically, § 11 provides a private remedy for any purchaser

28  of a security in which the registration statement "contained an untrue statement of a material

fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . ." *Id*. § 77k(a).  A purchaser who relied on an untruth or omission may recover the difference between the price he paid for the security (but not more than the public offering price) and the price at which he disposed of it or its value at the time of suit, if he still owns the security.  *Id*. § 77k(e).  Among those liable under § 11(a) are those who signed the registration statement, directors of or partners in the issuer, anyone who participated in the preparation of the registration statement, and any underwriters of the security.  *Id.* § 77k(a)(1)-(5).

In order to plead a § 11 claim, a plaintiff "must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment."  *In re Stac*, 89 F.3d at 1403-04.  Scienter is not required for liability under § 11.  *Id*. ("Defendants will be liable for innocent or negligent material misstatements or omissions.").  Neither § 11 nor § 12(a)(2) of the 1933 Act are governed by the heightened pleading standards of the PSLRA.  *See Falkowski v. Imation Corp*., 309 F.3d 1123, 1133 (9th Cir. 2002).  Nonetheless, 1933 Act claims that sound in fraud are subject to Fed. R. Civ. P. 9(b) and must state with particularity circumstances constituting fraud or mistake.  *Id.* (citation omitted).

## 2.   Section 12(a)(2)

Section 12(a)(2) of the 1933 Act imposes liability on any person who offers or sells securities by means of a prospectus or oral communication that includes "an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission) . . . ."  15 U.S.C. § 77l(a)(2).  To establish liability under this section, "a plaintiff must allege that the defendants did more than simply urge another to purchase a security; rather, the Plaintiff must show that the defendants solicited purchase of the securities for their own financial gain . . . ."  *In re Daou*, 411 F.3d at 1029.  In addition, the purchaser must demonstrate damages to recover under § 12.  *Id.* (citing *In re*

*Broderbund/Learning Co. Sec. Litig.*, 294 F.3d 1201, 1205 (9th Cir. 2002)). "Causation, however, is not a necessary element of a prima facie case under section 12 of the Securities Act." *Id.* (citing *Casella v. Webb*, 883 F.2d 805, 808 & n.8 (9th Cir. 1989) (holding that a plaintiff is entitled to recover whether or not the material misrepresentations caused the alleged damage). Section 12(a)(2) does not relate to either private offers or sales of securities on the secondary market, i.e., shares that have previously been sold. *See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 582, 115 S. Ct. 1061, 1073 (1995).

### 3.      Section 15(a)

Section 15(a) of the 1933 Act imposes joint and several liability upon every person who controls any person liable under sections 11 or 12. *See* 15 U.S.C. § 77o.  To establish that someone is a "controlling person," the plaintiff must show "that there was a relationship between the controlling and the controlled person" and that the controlling person exerted "actual power or influence" over the controlled person. *Durham v. Kelly*, 810 F.2d 1500, 1503-04 (9th Cir. 1987) (citation omitted).  The plaintiff must also show "not only that defendant had actual power or influence, but also that he was a 'culpable participant' in the alleged illegal activity." *Id.* (quoting *Christoffel v. E.F. Hutton & Co., Inc.*, 588 F.2d 665, 668 (9th Cir. 1978)).

## IV.    PLAINTIFFS' CLAIMS UNDER THE 1934 ACT

### A.      Section 10(b)

As noted earlier, to state a claim under § 10(b), a plaintiff must allege: "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *In re Daou*, 411 F.3d at 1014 (citing *Dura*, 125 S. Ct. at 1631).  "If one of these elements is missing, the [plaintiff's] claim fails." *Paracor*, 96 F.3d at 1157.

### 1.      Material Misrepresentation or Omissions

In this case, Plaintiffs claim that the following public statements during the Class Period were materially false and misleading:

- • A January 23, 2003 press release announcing that WEDC had acquired IDS and stating, in part, that "[w]e anticipate the acquisition will allow our entry into completely new markets with much larger revenue potential." (Compl. ¶ 53.)

- • A January 29, 2003 press release announcing WEDC's financial results for the first quarter of fiscal year 2003 in which the company reported a "record book-to-bill ratio of over 1.4 to 1" and a backlog that "grew to over $45 million; approximately 58% of which is for hi-reliability military microelectronics business." (Compl. ¶ 54.)

- • A February 11, 2003 Form 10-Q filed with the SEC confirming the previously-announced financial results for the first quarter of fiscal year 2003 in which the company announced that "[h]igh-reliability (*i.e.*, military) sales in the microelectronic segment increased $2.1 million over the comparable quarter, accounting for a 26% increase in high-reliability microelectronic revenue." (Compl. ¶¶ 55-56.)

- • An April 8, 2003 press release announcing "[o]ur second quarter fiscal 2003 produced a record backlog [of $54.4 million].  The growth of our backlog was led by the demand for White's Hi-Reliability military and defense products." (Compl. ¶ 58.)

- • A May 6, 2003 press release announcing financial results for second quarter of fiscal year 2003, which ended March 29, 2003, stating, in part "[t]he recent surge in defense spending is expected to help us achieve long-term growth and continued success for our microelectronics business." (Compl. ¶ 60.)

- • A May 7, 2003 analyst's report issued prior to the Secondary Offering that Plaintiffs paraphrase as "raising WEDC FY 2003 share earnings estimates by more than 14% and raising the 12-18 month price for WEDC shares to $13.00" and "forecast[ing] revenue growth of 28% and 24% for FY 2003 and 2004, respectively." (Compl. ¶ 61.)

- • A May 13, 2003 Form 10-Q filed with the SEC for the quarter ending March 29, 2003 stating that "military/industrial sales in the microelectronic segment were $10.4 million . . . an increase of $3.1 million, or approximately 41%" from the same quarter in 2002.  The 10-Q also stated that the financial statements had been prepared in

accordance with GAAP and that the company had disclosed "all significant deficiencies in the design or operation of internal controls." (Compl. ¶¶ 62-63.)

•   The June 2, 2003 announcement that WEDC had filed a Registration Statement with the SEC "for the public offering of up to 3,750,000 shares of its common stock, with 2,200,000 newly issued shared offered by the Company and 1,550,000 shares offered by selling shareholders." (Compl. ¶ 65.)

•   The July 3, 2003 Prospectus, which incorporated WEDC's first and second quarter 10-Qs, and which included WEDC's revenue recognition policy for products shipped to customers:

> The majority of the Company's sales are recognized when the products are shipped to the customer. Shipping terms are FOB shipping point, and title passes to the customer at shipment. There are no other obligations to the customer after shipment. Some product shipments to distributors may be returned based on conditions set forth in their distributor agreement. Therefore, product sales on these shipments to distributors are not recognized until the distributor sells the products to the end user.

(Compl. ¶ 67.)

•   A July 30, 2003 press release announcing third quarter results for fiscal year 2003 ending June 28, 2003 and reporting net sales that Plaintiffs say "purportedly exceeded analysts' consensus forecasts." (Compl. ¶ 70.)

•   A Form 10-Q filed with the SEC on August 12, 2003 for the quarter ending June 28, 2003 stating that "military/industrial sales in the microelectronic segment were $10 million . . . an increase of $0.7 million, or approximately 8%" from the same quarter in 2002. The 10-Q also stated that the financial statements had been prepared in accordance with GAAP and that the company had disclosed "all significant deficiencies in the design or operation of internal controls." (Compl. ¶¶ 71-72.)

1    •    A November 11, 2003 announcement that WEDC was rescheduling the release of its

2         earnings for the fourth quarter and fiscal year ending September 27, 2003 because the

3         company "needed additional time to complete its financial statements."  (Compl. ¶

4         74.)

5    •    A November 25, 2003 press release announcing fourth quarter and fiscal year 2003

6         results in which Plaintiffs claim "[t]he true facts concerning the Company's delay in

7         releasing its fiscal 2003 financial results became known–the Company revealed that

8         it would restate its financial results for the first three quarters of fiscal 2003."

9         Plaintiffs quote from the following portion of the press release:

10                  As a result of a change in the way the Company does business

11                  with a reseller that began in 2003, the Company determined that

12                  revenue relating to shipments to that reseller should be

13                  recognized at the time the reseller sells the product to its end

14                  customer rather than at the time the goods are shipped to the

15                  reseller.  As a consequence, the Company plans to restate its

16                  unaudited interim financial information for each of the first three

17                  quarters of fiscal 2003 to reflect the effects of this change.

18                  The restatement adjustments resulted in the deferral of

19                  $1,116,000 of net sales and $741,000 of related gross profit for

20                  the first nine months of fiscal 2003.  Of those amounts,

21                  $573,000 of net sales and $383,000 of related gross profit were

22                  recognized during the fourth quarter of 2003 when the reseller

23                  sold the related products through to its end customers.  The net

24                  impact of the change in the manner in which the Company

25                  recognized revenue with respect to this reseller was a reduction

26                  of the Company's net income for fiscal 2003 of $240,000.  As of

27                  September 27, 2003, the Company had deferred net sales of

28                  $543,000 and related gross profit of $358,000 on sales to the

1    reseller and expects to recognize such amounts in operating

2    results during the first six months of fiscal 2004 when the

3    related products are sold by the reseller to its end customers.

4  (Compl. ¶ 77.)

5  •    A February 11, 2004 press release announcing financial results for the first quarter of

6    fiscal year 2004 ending January 3, 2004 in which WEDC stated:

7    [S]ales of our Panelview displays to Garmin International and

8    GE Medical decreased by $4.3 million from the first quarter of

9    the prior year.  A key indicator of our future sales is the amount

10    of new orders received compared to current net sales.  New

11    orders totaled $32.1 million, resulting in a book-to-bill ratio of

12    1.23:1 for the quarter.  We have started and will continue laying

13    the groundwork to replace the revenue lost from the two large

14    display customers.  We are very pleased that our total display

15    segment bookings were $14.5 million, resulting in a book-to-bill

16    ratio of 1.3:1 for the quarter.

17  (Compl. ¶ 79.)

18  •    A May 5, 2004 press release announcing WEDC's second quarter results for the

19    period ending April 3, 2004 in which the company announced, in part:

20    We are pleased with the increase in our sales for the second

21    quarter of fiscal 2004 . . . .  We saw strong display products

22    design win activities during the quarter as the Display segment

23    received over $18 million of new orders, resulting in a book-to-

24    bill ratio of 1.35 to 1 for that segment.  However, during the

25    later part of the second quarter, the Defense Microelectronics

26    business began to see delays in award releases for several major

27    programs.   The Company believes that because of the

28    unexpected length and cost of the war in Iraq, and as part of a

1    broad overhaul of U.S. priorities, funds from weapons and
2    equipment procurement programs have been reallocated in
3    support of the war's ongoing operations.  Consequently this has
4    resulted in the delay of orders that were previously forecasted.
5    While we believe the risk of these programs being cancelled is
6    minimal, the delays affected new bookings for this segment in
7    the second quarter.

8    (Compl. ¶ 81.)

9    •    A June 9, 2004 press release announcing WEDC's forecast for the third quarter ending
10    July 3, 2004 in which the company said it expected net sales to be between $24-25
11    million and which Plaintiffs claim was "far short of analysts [sic] consensus estimates
12    of approximately $30 million . . . ."  In particular, WEDC announced that sales of
13    military microelectronic products would be $7 million for the quarter, down from $10
14    million during the same quarter the year before.  The press release said, in part, that
15    "sales of military microelectronic products for the third quarter of 2004 appear to have
16    been affected by a shift in military spending by the United States Department of
17    Defense from weapons and equipment procurement programs to spending in support
18    of other military priorities."

19    (Compl. ¶ 83.)

20    Plaintiffs have sufficiently identified which statements made by Defendants they
21    claim were false or misleading.  *See* 15 U.S.C. § 78u-4(b)(1).  The issue before the Court is
22    whether Plaintiffs have adequately alleged "the reason or reasons why the statement is
23    misleading, and, if an allegation regarding the statement or omission is made on information
24    and belief, the complaint shall state with particularity all facts on which that belief is
25    formed."  *Id.*

26    Plaintiffs allege, in large part, that Defendants' statements throughout the Class Period
27    were false or misleading because they hid the fact "that sales of the Company's
28    microelectronic products for use in military weapons and procurement programs had

1    stagnated.  Further, Defendants knew or recklessly disregarded that orders for future sales

2    of these products had been declining since at least the second quarter of fiscal 2003 due to

3    changed military priorities following cessation of the armed conflicts in Afghanistan and Iraq

4    . . . ."  (Compl. ¶ 80(a).)

5           From the Complaint, it appears that Defendants' first public statements about WEDC's

6    declining military sales occurred in May and June 2004.  The May 5, 2004 press release

7    stated in part that "the Defense Microelectronics business began to see delays in award

8    releases for several major programs" in the latter part of the second quarter due to the

9    "unexpected length and cost of the war in Iraq, and as part of a broad overhaul of U.S.

10   priorities . . . ."  (Compl. ¶ 81.)  On June 9, 2004, the last day of the Class Period, WEDC

11   issued a  press release  announcing that it expected net sales for the third quarter of fiscal

12   2004 to be between $24-25 million.  Plaintiffs claim that figure was "far short of analysts

13   [sic] consensus estimates of approximately $30 million . . . ."  (Compl. ¶ 81.)  Plaintiffs,

14   though, do not explain why either of these statements was false or misleading.  For example,

15   they do not point to any analysts' estimates  stating they expected revenues to be $30 million.

16   Nor do Plaintiffs provide sufficient information that  Defendants knew or believed earlier

17   than the third quarter of 2004 that sales of defense microelectronics products were on a

downward trend.[3]   Instead, Plaintiffs rely on various allegations that Defendants were improperly recognizing revenue and other GAAP violations to mask this downward trend.

To support their allegations that Defendants misled the investing public, Plaintiffs claim that Defendants engaged in a variety of deceptive accounting practices by: (1) materially overstating WEDC's backlog and bookings (Compl. ¶¶ 33-40); (2) recognizing revenue in violation of GAAP by counting revenues from resellers prior to resale of the product to the end user and by shipping customer orders prematurely (Compl. ¶¶ 44-49, 90-4, 96-99, 105); (3) materially overstating WEDC's military sales results by misclassifying lower-margin sales of commercial products as high-margin sales of military products (¶¶ 41-43); and (4) fostering material weaknesses in WEDC's internal controls.  (Compl. ¶¶ 30, 120.)

Defendants argue that Plaintiffs' claims do not meet the strict requirements for pleading securities fraud and should be dismissed.  (Defs.' Mot. to Dismiss  Compl. at 5.) In particular, Defendants argue that Plaintiffs do not plead actionable misstatements.  The Court agrees that Plaintiffs have not met the pleading requirements of PSLRA.

### a.    Improper Revenue Recognition Allegations

To state a claim for securities fraud, a plaintiff may plead that defendant overstated its revenues.  *In re Daou*, 411 F.3d at 1016 (noting that under GAAP "revenue must be

---

[3]WEDC's Form 10-K, filed in December 2003, stated, in part: "We are dependent on sales to defense-related companies for a large portion of our net sales and profits, and changes in military spending levels and patterns could negatively affect us . . . .  Military sales accounted for approximately 47%, 54% and 47% of our total net sales in fiscal 2003, 2001 and 2002, respectively.  Military spending levels depend on factors that are outside of our control.  Reductions or changes in military spending could have a material adverse effect on our sales and profits.  In addition, the United States defense industry is moving toward the purchase of commercial off-the-shelf products rather than those designed and manufactured to higher military specifications.  To the extent that our products are substituted with commercial off-the-shelf products, our operations would suffer.  Even if military spending continues to increase, shifts in military spending away from high technology programs to areas that we do not supply, such as personnel and infrastructure, would also negatively affect our sales and profits."  (Haus Decl., Ex. 3 at 11.)

1    earned before it is recognized") (citations and internal quotations omitted).  Thus, a plaintiff

2    pleading irregularities in revenue recognition should allege "such basic details as the

3    approximate amount by which revenues and earnings were overstated; (2) the products

4    involved in the contingent transaction; (3) the dates of any of the transactions; or (4) the

5    identities of any of the customers or company employees involved in the transaction."  *Id.*

6    (internal citations, quotations and alterations omitted).  While it is not necessary to  allege

7    every detail, a Plaintiff must allege enough information for a court to "discern whether the

8    alleged GAAP violations were minor or technical in nature, or whether they constituted

9    widespread and significant inflation of revenue."  *Id.* (internal citations and quotations

10   omitted).

11          Plaintiffs here allege that "[o]ne of the primary methods used by Defendants to

12   materially overstate WEDC's Class Period revenues involved the immediate recognition of

13   sales revenue on shipments to resellers and distributors even though the customers' right to

14   return any unsold goods had not expired." (Compl. ¶ 45.)  Plaintiffs contend that Defendants

15   violated WEDC's revenue recognition policy, which is stated as follows in WEDC's July 3,

16   2003 Prospectus:

17                  The majority of the Company's sales are recognized when the

18                  products are shipped to the customer.  Shipping terms are FOB

19                  shipping point, and title passes to the customer at shipment.

20                  There are no other obligations to the customer after shipment.

21                  Some product shipments to distributors may be returned based

22                  on conditions set forth in their distributor agreement.  Therefore,

23                  product sales on these shipments to distributors are not

24                  recognized until the distributor sells the products to the end user.

25   (Compl. ¶ 67.)

26          Plaintiffs point to WEDC's November 25, 2003 press release accompanying its

27   Restatement as evidence that Defendants violated WEDC's revenue recognition policy. The

28   pertinent statements in the press release say:

1    As a result of a change in the way the Company does business

2    with a reseller that began in 2003, the Company determined that

3    revenue relating to shipments to that reseller should be

4    recognized at the time the reseller sells the product to its end

5    customer rather than at the time the goods are shipped to the

6    reseller.  As a consequence, the Company plans to restate its

7    unaudited interim financial information for each of the first three

8    quarters of fiscal 2003 to reflect the effects of this change.

9    (Compl. ¶ 77.)

10    Plaintiffs contend that WEDC's statements constitute an admission that "WEDC

11    improperly recognized revenue upon shipment of product to certain of its resellers that were

12    granted rights of return during the Class Period, which was in direct contravention of its

13    publicly disclosed accounting policy." (Compl. ¶ 93.) Defendants argue that Plaintiffs have,

14    in essence, re-written WEDC's revenue recognition policy by inserting the word "resellers"

15    for "distributor."  (Defs.' Reply in Opp'n to Mot. to Dismiss Compl. for Violations of Federal

16    Securities Laws ("Defs.' Reply") at 2.)  Defendants also argue that Plaintiffs' claims lack the

17    specificity required by PSLRA because they failed to identify the customer that was the

18    subject of the Restatement, and because they failed to show that the customer was a

19    "distributor" whose shipments were returned "based on conditions set forth in their

20    distributor agreement." (Defs.' Reply at 2.)

21    The Court agrees that Plaintiffs have failed to show that WEDC's stated revenue

22    recognition policy for certain distributors applies to the reseller mentioned in WEDC's

23    Restatement.  Plaintiffs have not alleged that this particular reseller was a distributor, as that

24    term is used in Defendants' revenue recognition policy.  Plaintiffs have not alleged that this

25    particular reseller had a contractual agreement with WEDC that granted the reseller a right

26    of return.  Nor have Plaintiffs directed the Court to any contractual terms with this reseller

27    evidencing a right of return that Defendants violated.  Plaintiffs provide no information that

28    would lead the Court to believe that sales to the reseller at issue were not among the majority

that WEDC recognized when the products were shipped to the customer, and that, in 2003, WEDC entered into a different arrangement with that one reseller.  Therefore, Plaintiffs have not adequately alleged that WEDC violated the terms of its revenue recognition policy.  Furthermore, the Court finds that Plaintiffs have failed to meet other requirements set forth in *Daou*, such as the "products involved in the contingent transaction, the dates of any of the transactions, or the identities of any of the customers or company employees involved in the transaction."  *In re Daou*, 411 F.3d at 1016.

Plaintiffs claim that Defendants' improper revenue recognition was not limited to one reseller because WEDC restated operating results for both its microelectronic and display products "[m]aking it highly likely that WEDC engaged in these improper practices with multiple resellers and distributors." (Compl. ¶ 46(a).)  The Court has combed the Complaint for any allegations or factual assertions by Defendants that would back up this claim, yet did not find any.[4]

Plaintiffs also claim that "WEDC engaged in a pattern of improper revenue practices during, at least, the Class Period."  (Compl. ¶ 96.)  For this proposition, Plaintiffs cite statements by former employees, CI 6 and CI 1.[5]  CI 6, an accounting department employee

---

[4]Plaintiffs are advised, if they choose to re-file their Complaint, to "give considered thought to efficient pleading and meaningful analysis."  *In re PetSmart, Inc. Sec. Litig.*, 61 F.Supp.2d 982, 991 n.3 (D. Ariz. 1999).  For example, it is extremely difficult and time consuming for the Court to piece together the alleged misrepresentations and omissions with factual assertions located in other parts of the Complaint.  It would save considerable effort if Plaintiffs could somehow group together the alleged misrepresentations and reasons why they are misleading so that the Court is not forced to continually jump around the document.

[5]Because the PSLRA requires that the complaint "state with particularity all facts on which [a] belief is formed," the plaintiff must reveal "the sources of her information."  *In re Silicon Graphics*, 183 F.3d at 983 (citation and internal quotation marks omitted).  Thus, a plaintiff relying on confidential witnesses, as in this case, must describe the sources "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged and the complaint contains adequate corroborating details."  *In re Daou*, 411 F.3d at 1015-16 (citation and internal quotation marks omitted) (noting that it is unnecessary to name the confidential witnesses as long as they meet the above standards).  While it is doubtful that all of Plaintiffs' confidential

of a WEDC subsidiary from October 2000 to September 2003, said it was "commonplace" for WEDC to "prematurely ship product to customers so that revenue recognition could be accelerated in a particular accounting period" which "often resulted in the rejection of product by the Company's customers." (Compl. ¶ 97.)  CI 6 "recalled one such premature shipment to a New York-based customer in an amount exceeding $100,000." (Compl. ¶ 97.) The Complaint states that those goods were ultimately returned to a facility in Phoenix. (Compl. ¶ 97.)  That statement is unsupported by any additional information such as whether CI 6 was actually involved in the transaction, the date of the shipment and return, whether it occurred during the Class Period, the identity of the customer, or the products.  The Complaint implies, but does not state, that WEDC improperly recognized revenue from that shipment.  Also, as the Ninth Circuit stated in *In re Daou*, "although overstatement of revenues in violation of GAAP may support a plaintiff's claim of fraud, the plaintiff must show with particularity how the adjustments affected the company's financial statements and whether they were material in light of the company's overall financial position." *In re Daou*, 411 F.3d at 1019.  Plaintiffs in this case have not shown how this particular event resulted in an overstatement of revenues and whether the overstatement was material.

Plaintiffs also rely on CI 1, a former sales representative employed by WEDC from April 1997 to November 2003, to allege that WEDC was improperly recognizing revenue. CI 1 "recounted premature shipments approximating $824,000 to Niles Audio Corporation and $100,000 to InterMec during the Class Period." (Compl. ¶ 98.)  The Complaint, again, implies, but does not state that WEDC overstated its revenues and earnings by those amounts.  Nor do the allegations identify the employees, the products involved, the dates of the transactions, how the adjustments affected WEDC's financial statements or whether the adjustments were material.  Thus, this claim by a confidential informant also fails to meet the PSLRA's particularly requirements. *See In re Daou*, 411 F.3d at 1016.  This same informant

informants were in positions that would allow them to possess the information alleged, the Court will not discount the allegations of the confidential informants at this time since it is dismissing these claims for other reasons.

1   claims that "WEDC's sales personnel routinely entered into side agreements which granted

2   customers selling concessions and/or extended payment due dates."  (Compl. ¶ 98.)  Yet,

3   once again, the Complaint fails to provide *any* specifics to back up this claim.

4           None of the allegations by the confidential informants rise to the level of specificity

5   approved of by the Ninth Circuit in *In re Daou*.  In that case, the Ninth Circuit found specific

6   allegations quantifying and contrasting the revenue Defendants actually recognized and the

7   revenue Defendants should have recognized had they applied proper accounting methods.

8   For instance, the plaintiffs alleged and provided a specific example of the company

9   immediately recognizing 20% of a contract price before the contract was even signed.  *Id.*

10  at 1019.  The company never received the contract and the plaintiffs "described how this

11  allegedly premature recognition affected Daou's financial bottom line" by stating "[h]ad

12  Daou reported revenue in line with the amount it was entitled to bill customers pursuant to

13  its contracts, actually reflecting contract work done to date, revenue for 3Q97 would have

14  been only $4.9 million, 48% less than publicly reported ($11.3 million)."  *Id.*  The plaintiffs

15  in *In re Daou* also provided "the dates of some of the related transactions and the identities

16  of the customers and the company employees involved in the transactions."  *Id.*  Plaintiffs

17  in this case simply do not provide the details necessary to survive a motion to dismiss under

18  the PSLRA.

19

20                      **b.      Backlogs and Bookings of Unfilled Orders**

21          Plaintiffs allege that WEDC's quarterly earnings announcements were misleading

22  because WEDC used non-GAAP measures to report its backlog of unfilled orders, bookings

23  or new orders and its book-to-bill ratios.  (Compl. ¶ 33.)  Plaintiffs quote a WEDC

24  underwriter's report issued just before the Secondary Offering that discussed WEDC's

25  "sizable" backlog. (Compl. ¶ 34.)  To allege the falsity of such a statement under Federal

26  Rule of Civil Procedure 9(b), a plaintiff may "point[] to inconsistent contemporaneous

27  statements or information (such as internal reports) which were made by or available to the

28  defendants."  *In re GlenFed*, 42 F.3d at 1549.  A plaintiff must give particulars about the

1   non-public information, such as: "what medium contained the information (e.g., internal

2   reports); when the information was made available to people inside the company; which of

3   the Defendants the information would have been available to; or when they were aware of

4   the information." *Yourish*, 191 F.3d at 994.  Plaintiffs, again, make only vague allegations

5   about how WEDC allegedly misled investors.  Plaintiffs rely on confidential informants who

6   state generally that management "exert[ed] intense pressure on sales personnel to book

7   revenue and meet sales revenue objectives" and persuaded the sales representatives "to raise

8   their quotas beyond levels that could be reasonably obtained."  (Compl. ¶¶ 37-39.)  As

9   Defendants point out, none of the confidential informants claim that WEDC reported these

10  internal sales goals as actual bookings and backlog.

11      Plaintiffs allege that sales/marketing personnel prepared electronic spreadsheets

12  showing what WEDC was going to book during a given period and that those spreadsheets

13  were "used by the accounting department as the basis for what the Company was going to

14  report." (Compl. ¶ 39.)  Critically, Plaintiffs do not point to any particular spreadsheet, any

15  specific misinformation in a spreadsheet, or even whether such information was actually

16  reported to the public as bookings and backlog.  The Complaint merely states that these

17  spreadsheets were the "basis" for the reports and not that those spreadsheets became the

18  actual reports.  Again, these statements are simply too vague to meet the PSLRA's stringent

19  pleading requirements.

20      The one seemingly specific allegation in the Complaint comes from CI 2, a senior

21  buyer, who says WEDC "improperly inflated its backlog of customer [sic] at WEDC's

22  Panelview, Inc. subsidiary and that these manipulative activities accelerated immediately

23  prior to the Company's secondary offering announced in June 2003 and completed during

24  July 2003." (Compl. ¶ 40.)  But, aside from the allegation, Plaintiffs do not state with the

25  required particularity how WEDC allegedly inflated the backlog at this subsidiary.  Nor do

26  Plaintiffs say whether CI 2 was involved in activities at Panelview, Inc., which would assist

27  the Court in determining whether CI 2 is an employee who would possess the type of

28  information alleged.  The Complaint does not provide an approximate amount of the alleged

1   improper inflation of the backlog or how that amount would have changed WEDC's bottom

2   line.  Thus, this allegation does not meet the PSLRA's requirements of particularity.

3             **c.   Misclassified Sales**

4        Plaintiffs claim that WEDC "materially misrepresented the operating results of the

5   Company's product segments by improperly reporting revenues and costs on transactions for

6   the sale of lower-margin 'commercial' products as sales of high-margin military and defense

7   products."  (Compl. ¶ 41.)   In this way, Plaintiffs allege that Defendants "misclassified

8   millions of dollars of sales revenue" during fiscal year 2003.  (Compl. ¶ 41.)   These

9   statements, too, lack the particularity required to survive a motion to dismiss.  For example,

10  Plaintiffs do not point to any specific statements made by Defendants in which they allegedly

11  reported commercial sales to be sales of high-margin military products.  Nor do they point

12  to any particular transactions that WEDC reported as military sales that should have been

13  reported as commercial sales.

14       CI 3, a divisional controller, stated that "in order to make it appear that the commercial

15  sales were sales of high-margin military products only the cost of 'raw materials' . . . were

16  reported to investors in the segment results included in WEDC SEC filings." (Compl. ¶ 42.)

17  CI 3 said that "through a series of 'intercompany' transactions [WEDC] hid the actual cost

18  to design, manufacture and distribute these products."  (Compl. ¶ 42.)  CI 3 allegedly

19  prepared "an analysis of the numbers' detailing the improper intercompany transactions" that

20  he gave to Defendant Rodes.  If Plaintiffs had provided any of the specific information in the

21  alleged analysis, their claim might survive a motion to dismiss.  Presumably CI 3, who

22  prepared the analysis, would be able to provide some details, yet Plaintiffs have not given

23  the Court any information contained in the analysis.  Thus, this allegation, too, fails for its

24  lack of particularity.

25            **d.   Material Weaknesses in Internal Controls**

26       Finally, Plaintiffs point to a statement in WEDC's 2003 Form 10-K as an admission

27  that "[D]efendants knew that the public documents and statements issued or disseminated in

28  the name of the Company were materially false and misleading." (Compl. ¶¶ 119-20.)  The

10-K references the company's Restatement of its financial statements for the first three quarters of fiscal 2003, and says that "[w]e believe that this material weakness is attributable to the Company's recent growth in terms of both size and complexity coupled with the fact that accounting and finance department resources had not been added to support that growth." (Compl. ¶ 120.)  Plaintiffs claim that Defendants "failed to disclose that WEDC's finance and accounting functions were inadequately staffed and/or lacked the expertise necessary to perform even the most basic of accounting functions such as recording and reporting revenue in accordance with the Company's publicly stated policies."  (Compl. ¶ 123.)   While these allegations appear to have some merit, they are lacking in specifics.

Plaintiffs also allege that Defendants hid "the true facts concerning WEDC's financial condition and future prospects from investors" by ordering certain employees to take "unpaid vacations" and "pay-cuts." (Compl. ¶ 124.)  For instance, CI 6 said that during fiscal 2003 certain employees of the company's subsidiaries were asked to take a 5% pay cut so that WEDC "would continue to appear profitable." (Compl. ¶ 124(a).)  This allegation, though, is not supported by any names of employee(s) who took pay cuts or their positions with the company or dates.  Other confidential informants, CI 8 and CI 9, claim that employees were ordered "as early as June 2004 . . . to take up to two to three weeks unpaid vacation in order to allow the Company to meet earnings guidance."  (Compl. ¶ 124(b).)  CI 9 claims that Defendant Shokrogazar admitted during sales meetings that WEDC's military business was declining, and that "because military sales were down, employees at WEDC in Arizona were required to take a total of two or three weeks unpaid vacations."  (Compl. ¶ 124(b).)  CI 9 stated that during July and August 2004, he or she "took at least one unpaid day off each week" in order to cut WEDC's payroll costs.  (Compl. ¶ 124(b).)  The timing of these claims do not support the allegation that Defendants were hiding the true facts concerning the company's financial condition.  Plaintiffs do not say when Defendant Shokrgozar talked of declining military sales, but the juxtaposition with the other allegations about pay cuts and unpaid vacations suggest that Shokrgozar's comments were made in the summer of 2004.  This would be after the May 2004 press release stating that during the later part of the second

1   quarter, "the Defense Microelectronics business began to see delays in award releases for
2   several major programs." (Compl. ¶ 81.) Also, CI 8 and CI 9 say that the order to take
3   unpaid vacations occurred "as early as June 2004." WEDC issued a press release on June
4   9, 2004, the last day of the Class Period, announcing that "sales of military microelectronic
5   products will be approximately $7 million in the third quarter of fiscal 2004," down from $10
6   million in the prior two quarters. (Compl. ¶ 83.) Thus, Defendant Shokrgozar's comments
7   about declining military sales during sales meetings, if made in the summer of 2004, would
8   be consistent with WEDC's public comments around that same time. The only specific
9   allegation of an employee being ordered to take unpaid days off, CI 9's, occurred in July and
10  August 2004, *after* WEDC had announced in June 2004 the decline in military orders and
11  *after* the close of the Class Period. Thus, these allegations fail to state a claim sufficient to
12  survive a motion to dismiss.

13      None of Plaintiffs' allegations regarding Defendants' alleged misrepresentations and
14  accounting errors are sufficiently particularized to meet the stringent pleadings requirements
15  under Federal Rule of Civil Procedure 9(b) and the PSLRA. This deficiency is fatal to
16  Plaintiffs' claim under Rule 10b-5 of the 1934 Act because if any one of the five elements
17  of a Rule 10b-5 claim is missing, then the entire claim fails. *See Paracor*, 96 F.3d at 1157.
18  Therefore, the Court need not analyze the claim to determine whether Plaintiffs have
19  successfully pleaded the other four elements and will grant Defendants' motion to dismiss
20  Plaintiffs' claim under § 10(b) of the 1934 Act.

21      **B.**      **Section 20(a)**

22      To be liable as a "controlling person" under section 20(a) of the 1934 Act, "the
23  defendants must be liable under another section of [the 1934 Act]." *Heliotrope*, 189 F.3d at
24  978 (citing 15 U.S.C. § 78t(a); *Paracor*, 96 F.3d at 1161). The Court finds that the claim for
25  control-person liability against the Individual Defendants under § 20(a) of the 1934 Act must
26  be dismissed because the Complaint does not state a claim for any primary violation of the
27  1934 Act.

28  **V.     PLAINTIFFS' CLAIMS UNDER THE 1933 ACT**

Defendants argue that Pipefitters' 1933 Act claims, raised for the first time in the February 14, 2005 Complaint, should be dismissed, or, alternatively, stricken, on the ground that: (1) those claims are barred by the statute of limitations; (2) Pipefitters has failed to meet the 1933 Act's pleading requirements; (3) Pipefitters lacks standing to represent the proposed class. Because the Court finds that Pipefitters do not have standing to bring its claims, it is unnecessary for the Court to address Defendants' other arguments.

### A. Notice Under the PSLRA

In addition to the heightened pleading standard for securities fraud cases, the PSLRA made other "very significant changes in the way securities class actions are to be litigated . . . . " *In re Cavanaugh*, 306 F.3d 726, 737 (9th Cir. 2002). Now, the plaintiff who first files suit must "publish a notice explaining the nature of his claim and advising other potential plaintiffs that they may move to be appointed lead plaintiff" and "submit sworn certifications stating that they did not purchase the security in question at the direction of their lawyers or in order to participate in the action . . . ." *Id.* at 737-38 (citing 15 U.S.C. § 78u-4(a)(3)(A) & (a)(2)(A)(ii)). The PSLRA "preclude[s] the same party (except with the approval of the court) from serving as lead plaintiff in more than five securities class actions over a three-year period," and it requires that "the plaintiff with the greatest financial stake in the outcome of the case be appointed lead plaintiff, provided he satisfies the requirements of Rule 23 . . . ." *Id.* (citing 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) & (a)(3)(B)(vi)).

Under the notice requirement, proposed lead plaintiffs must advise potential class members about "the pendency of the action, the claims asserted therein, and the purported class period." 15 U.S.C. § 77z-1(a)(3)(A)(I). "[T]he description of the claims in the notice must be congruent with the claims as alleged in the pleadings." *Wenderhold v. Cylink Corp.*, 188 F.R.D. 577, 579 (N.D. Cal. 1999) (citing *Ravens v. Iftikar*, 174 F.R.D. 651, 656-661 (N.D. Cal. 1997)). The main purpose of the notice requirement is to provide "information describing the legal and factual basis of the claims" so that an investor can "make an informed determination whether intervention is appropriate to protect his interests." *Raven*s, 174 F.R.D. at 654.

In this case, the proposed lead plaintiff published a notice on July 23, 2004 stating, in relevant part:

> [A] class action has been commenced . . . on behalf of purchasers of [WEDC] securities during the period between January 23, 2003 and June 9, 2004 (the "Class Period").
>
> . . . .
>
> The complaint charges [WEDC] and certain of its officers and directors with violations of the Securities Exchange Act of 1934.
>
> . . . .
>
> The complaint alleges that during the Class Period, defendants issued materially false and misleading statements regarding [WEDC's] increasing revenues and long-term growth prospects.  In truth and in fact, however, defendants knew or recklessly disregarded that [WEDC's] increasing revenues and earnings could not be sustained and that orders for sales of the Company's microelectronic products for use in military weapons and procurement programs had been declining since at least the second quarter of fiscal 2003.  Defendants failed to disclose that the declines marked a long-term change in priorities by the U.S. military following the build-up of orders prior to the armed conflict in Iraq.
>
> On June 9, 2004, [WEDC] issued a press release announcing its forecast for the third quarter of fiscal 2004, the period ending July 3, 2004.  The Company announced that it expected net sales to be between $24-$25 million, far short of analysts' consensus estimates of approximately $30 million in net sales for the third quarter 2004.

1
2
3

    Following this news, the Company's stock plummeted 83 cents or 13.9% to $5.16 per share, on extremely heavy trading volume.

4
5
6

    Plaintiff seeks to recover damages on behalf of all purchasers of [WEDC] securities during the Class Period (the "Class") . . . .

7
8
9

(Decl. of Francis J. Balint, Jr. in Support of the Wayne County Group's Mot. for Consol., Appointment as Lead Pl. and Approval of Lead Pl.'s Selection of Lead and Liaison Counsel, Ex. A.)

10
11
12
13
14
15
16
17
18
19
20

  The published notice never mentions the 1933 Act, and it makes no reference to the Registration Statement or events related to the Secondary Offering, which are at the heart of Pipefitters' 1933 Act claims.  Likewise, the four complaints that this Court allowed to be consolidated were all based on the 1934 Act, as Lead Plaintiff Wayne County Group,[6] acknowledged in its motion for appointment as lead plaintiff: "These [four related] actions are brought pursuant to §§ 10(b) and 20(a) of the [1934 Act] . . . and Rule 10b-5 . . . .  [T]he Actions should be consolidated because they each involve substantially similar issues of law and fact."  (Mem. of P. & A. in Support of the Wayne County Group's Mot. for Consol., Appointment as Lead Pl. and Approval of Lead Pl.'s Selection of Lead and Liaison Counsel at 1-2.)  Although Wayne County lists Pipefitters as a class member in its motion for consolidation and appointment, it never mentions any 1933 Act claims.

21
22
23
24

  The original four complaints that this Court allowed to be consolidated were all predicated on the 1934 Act.  The June 9, 2004 press release was the event that set off the filing of those suits.  There is no possible way that Pipefitters' claims, even if they did relate back to some of the events alleged in the original four complaints, are tied to the June 2004

25
26
27
28

   [6]On December 16, 2004, the Court appointed Wayne County Group, consisting of Wayne County Employees' Retirement System and Mahasen Samaravijaya, to be lead plaintiff.  Later, at the request of Mr.Samaravijaya, the Court issued an amended Order removing him as lead plaintiff and appointing only Wayne County as lead plaintiff. Pipefitters was never appointed lead plaintiff.

press release because in November 2003 Pipefitters sold all its shares purchased around the time of the Secondary Offering. Because Pipefitters' 1933 Act claims do not relate in any way to the June 2004 press release, Pipefitters' claims are separate and subject to the requirements of PSLRA, which Pipefitters has not fulfilled. Pipefitters has not filed a complaint or sought lead plaintiff status; it has not published a notice advising other potential 1933 Act claimants of the suit and the opportunity to be appointed lead plaintiff; nor has Pipefitters demonstrated that it has the greatest financial stake in the outcome of the suit, which is doubtful given that Pipefitters' alleged losses amount to approximately $500. Therefore, the Court will grant Defendants' Motion to Strike Pipefitters' Claims.

The cases cited by Plaintiffs do not convince the Court otherwise. The one seemingly apposite case from the Northern District of California said "it was a close question" whether the lead plaintiff's notice, which informed potential class members that a complaint had been filed alleging 1934 Act violations, nonetheless provided adequate notice to potential 1933 Act claimants. *See In re Portal Software, Inc. Sec. Litig.*, No C-03-5138 VRW (N.D. Cal. Mar. 9, 2005) (order granting Plaintiffs leave to file an amended complaint and denying as moot defendant's motion to dismiss and strike). This Court does not find the case before it a close question. The class period in *In re Portal* ran from May 20, 2003 to November 13, 2003. The secondary offering of securities in that case leading to the alleged 1933 Act violations occurred on September 12, 2003. Thus, only two months elapsed between the time of the secondary offering and the end of the class period, making it more likely that those who bought securities in the secondary offering were apprised of their potential 1933 Act claims even though the lead plaintiff's notice only alleged 1934 Act violations. The Class Period in this case spans eighteen months, from January 2003 to June 2004. WEDC announced that it had filed the Registration Statement in June 2003, and the Secondary Offering occurred in July 2003. The triggering event for this litigation – the June 9, 2004 press release about third quarter sales – occurred eleven months after WEDC's Secondary Offering. Plaintiffs' July 23, 2004 notice of the lawsuit only discussed WEDC's June 9, 2004 press release and 1934 Act claims, making it unlikely that potential 1933 Act claimants were

on notice of any claims related to the Registration Statement and Secondary Offering. Therefore, the Court finds that Plaintiffs did not comply with PSLRA's notice requirement and will grant Defendant's motion to strike Pipefitters' 1933 Act claims.

**B.   Certain 1933 Act Claims are Subject to Rule 9(b) of the Federal Rules of Civil Procedure**

Even if Pipefitters 1933 Act claims complied with the notice requirements of the PSLRA, they still fail for their lack of particularity. That is because certain §11 claims under the 1933 Act are subject to Federal Rule of Civil Procedure 9(b) if the complaint "sounds in fraud." *In re Daou*, 411 F.3d at 1027. *See also In re Stac*, 89 F.3d at 1404-04 ("We now clarify that the particularity requirements of Rule 9(b) apply to claims brought under Section 11 . . . when, as here, they are grounded in fraud."). A claim "sounds in fraud" when the plaintiff alleges "a unified course of fraudulent conduct" and "rel[ies] entirely on that course of conduct as the basis of a claim." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003). When a claim is "grounded in fraud" or "sound[s] in fraud," then "the pleading of that claim as a whole must satisfy the particularity requirements of Rule 9(b)." *Id.* (citation omitted).

The Ninth Circuit has adopted the reasoning of the Fifth Circuit and held that "Rule 9(b) may prove fatal to 1933 Securities Act claims 'grounded in fraud' when the complaint makes a 'wholesale adoption' of the securities fraud allegations for purposes of the Securities Act claims." *In re Daou*, 411 F.3d at 1028  (quoting *Lone Star Ladies Inv. Club v. Schlotzky's Inc*., 238 F.3d 363, 368 (5th Cir. 2001) (noting that "[a] district court need not rewrite a deficient complaint" nor "sift through allegations of fraud in search of some "lesser included' claim of strict liability.").

The court in *In re Daou* found that the plaintiffs' third amended complaint sounded in fraud, notably because the very first sentence of the complaint said that the action was brought on behalf of the purchasers of common stock "seeking damages *resulting from a fraudulent scheme and course of business by defendants*, which harmed [such] purchasers." *In re Daou*, 411 F.3d at 1028 (emphasis in original). The court found that the complaint

"fully incorporate[d] all allegations previously averred" and made a "'wholesale adoption' of the securities fraud allegations for purposes of the Securities Act claims."  *Id.*

In this case, Plaintiffs allege:

> Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of WEDC common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding WEDC's business, operations, management and the intrinsic value of WEDC common stock; (ii) allowed the Company to complete the acquisition of Interface Data Systems, Inc. ("IDS") by using its artificially inflated shares as currency for the transaction; (iii) allowed the Company to complete the Secondary Offering thereby generating approximately $45 million in proceeds; (iv) allowed Defendant White to sell personally-held WEDC common stock in the Secondary Offering at an artificially inflated price generating proceeds of $3 million and sell another $2 million of personally held WEDC common stock in the open market; and (v) caused Plaintiffs and other members of the Class to purchase WEDC common stock at artificially inflated prices."

(Compl. ¶ 22.)

In the three counts brought under the 1933 Act, Pipefitters "repeats and realleges each and every allegation contained above, except to the extent that such allegations charge Defendants with intentional or reckless misconduct."  (Compl. ¶¶ 128, 138, 146.)  For the three 1933 Act counts, Pipefitters "expressly disavows any allegation that any Defendant acted with scienter or fraudulent intent, which is not an element of Securities Act claims."  Notwithstanding Pipefitters' disclaimer, this entire Complaint sounds in fraud.  As Plaintiffs

themselves allege in the body of the Complaint, "[e]ach of the defendants is liable as a participant in *a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of WEDC common stock . . . ."* (Compl. ¶ 22) (emphasis added.)  Each 1933 Act claim "repeats and realleges each and every allegation . . . ."  Therefore, Pipefitters' 1933 Act claims sound in fraud and must meet the heightened pleading standard set out in Rule 9(b).

As discussed earlier regarding Plaintiffs' 1934 Act claims, Plaintiffs did not plead fraudulent conduct with sufficient particularity.  For the same reasons that Plaintiffs' claims failed under the 1934 Act, Plaintiffs' claims under § 11 of the 1933 Act fail.  Likewise, Plaintiffs' claims under §§ 12(a)(2) and 15 fail because they do not adequately allege that Defendants made an omission or untrue statement of a material fact.

In sum, the Court finds that Plaintiffs have not pled securities fraud with sufficient particularity, either under the 1933 Act or the 1934 Act, to survive a motion to dismiss for failure to state a claim.

**IT IS ORDERED** granting Defendants' Motion to Dismiss the Lead Plaintiff's Consolidated Complaint for Violations of Federal Securities Laws (Doc. 44).

**IT IS FURTHER ORDERED** granting Defendants' Motion to Strike Pipefitters' 1933 Act Claims (Doc. 43).

**IT IS FURTHER ORDERED** granting in part and denying in part Defendants' Request for Judicial Notice and Identification of Documents Incorporated by Reference into the Complaint (Doc. 46).

**IT IS FURTHER ORDERED** that any amended complaint must be filed within thirty (30) days of the issuance of this order.

DATED this 14th day of February, 2006.

_Susan R. Bolton_
Susan R. Bolton
United States District Judge

- 37 -